# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE TATUM, | Case No.  1:19-cv-01263-SAB |
| Plaintiff, | ORDER GRANTING IN PART PLAINTIFF'S SOCIAL SECURITY APPEAL AND REMANDING FOR FURTHER PROCEEDINGS |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | (ECF Nos. 20, 22, 23) |
| Defendant. | |

## I.

## INTRODUCTION

Jane Tatum ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

For the reasons set forth below, Plaintiff's Social Security appeal shall be granted in part.

/ / /

/ / /

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge and the matter has been assigned to the undersigned for all purposes.  (See ECF Nos. 7, 8, 24.)

**II.**

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff filed a prior application for disability benefits on July 24, 2012, and was found not to be disabled on March 1, 2013.  (AR 128, 164-167.)

Plaintiff protectively filed a Title XVI application for supplemental security income on July 18, 2014.  (AR 141.)  Plaintiff's applications were initially denied on December 8, 2014, and denied upon reconsideration on October 1, 2015.  (AR 168-172, 174-178.)   Plaintiff requested and received a hearing before Administrative Law Judge Nancy M. Stewart ("the ALJ").  Plaintiff appeared for a hearing on April 11, 2018.  (AR 63-98.)  On July 20, 2018, the ALJ found that Plaintiff was not disabled.  (AR 17-31.)  The Appeals Council denied Plaintiff's request for review on March 19, 2019.  (AR 6-8.)

Plaintiff filed an opening brief in support of remand on July 27, 2020.  (ECF No. 20.)  On August 27, 2020, the Commissioner file an opposition, and Plaintiff filed a reply on September 10, 2020.  (ECF Nos. 22, 23.)

**A.     Hearing Testimony**

Plaintiff appeared and testified at the April 11, 2018 hearing with counsel.  (AR 68-84, 92-96.)  Plaintiff was born on February 27, 1992, and was 26 years old on the hearing date.  (AR 68.)  She is 5 foot 3 inches tall and weighs 119 pounds.  (AR 68-69.)  Plaintiff received a bachelor's degree.  (AR 68.)

Plaintiff worked part-time, last working toward the end of the spring semester in 2013.  (AR 70.)  She was tutoring approximately 12 hours per week.  (AR 70.)  Plaintiff never made more than $1,000.00 per month.  (AR 71.)

Plaintiff lives with her parents.  (AR 71.)  Plaintiff cannot do as much as she was able to do when she was healthy.  (AR 71.)  She does what she thinks that she can, but not great when she is not feeling well.  (AR 71.)  Plaintiff can help very little with the dishes.  (AR 71.)  She washes her own personal dishes, but generally does not wash other people's dishes because it hurts her back to bend over the sink and standing more than just a few minutes will often cause her heart to race, fatigue, sweating and nausea.  (AR 72.)  On a bad day, Plaintiff can stand for

1    five minutes and, on a good day, she can stand for fifteen minutes.  (AR 72.)  It takes Plaintiff

2    about five minutes to wash her own dishes.  (AR 72.)

3        Plaintiff does virtually no chores around the house.  (AR 72.)  She does not make her bed,

4    do her own laundry, and rarely cooks.  (AR 72.)  She will cook something once or twice a month

5    and may bake something because she finds it therapeutic.  (AR 72.)  She will have to sit down in

6    between and just does one project.  (AR 73.)  She will cook on the stovetop from twenty to thirty

7    minutes or she will feel it the next day.  (AR 73.)  She will sit on a stool and try to elevate her

8    feet.  (AR 73.)

9        Plaintiff's main symptoms are exhaustion, pain, muscle tension, cognitive disfunction,

10   brain fog, lack of stamina, and post-exertional malaise.  (AR 73.)  Plaintiff is unable to maintain

11   attention for long periods of time due to exhaustion.  (AR 74.)  Plaintiff may feel up to doing

12   something on one day, but if she pushes "past this energy envelope" she will be more fatigued

13   the next day.  (AR 74.)  Plaintiff is fatigued every day.  (AR 74.)  She never wakes up feeling

14   rested.  (AR 74.)  She will have two days per month where she wakes up and tosses and turns at

15   night.  (AR 74.)  The rest of the time she sleeps great throughout the night.  (AR 74.)  If she gets

16   up during the night to use the restroom, she will fall right back to sleep.  (AR 74.)  She sleeps

17   great, but wakes up not rested.  (AR 74.)

18       Plaintiff has used a mouth guard and then had a retainer due to TMJ and "a late-bloomer

19   jaw" and her bite being off.  (AR 74-75.)  She had surgery and no longer can wear the mouth

20   guard due to the retainer.  (AR 75.)  She needs to get back to wearing her retainer.  (AR 75.)  It

21   will disturb her sleep so she will inadvertently take it off during the night.  (AR 75.)

22       Plaintiff goes to bed between 4 to 7 a.m. and gets up between 2 and 4 p.m.  (AR 75.)

23   When she wakes up she is dehydrated and the first few hours of the day she drinks water and

24   Gatorade to hydrate herself.  (AR 75.)  This helps her be more upright and clearheaded so she

25   can accomplish some things.  (AR 75-76.)  Her brain fog is worse in the first part of the day until

26   the evening.  (AR 76.)  When she is hydrated, the brain fog lifts a little so that she can get things

27   done, as well as it is cooler in the evenings and there are less distractions so she can focus better.

28   (AR 76.)

1    Plaintiff will pay her bills, do things like preparing for the hearing, reply to family
2    members, and do basic communication through test or email.  (AR 76.)  Plaintiff will spend one
3    to two hours doing these things while she is lying down.  (AR 76.)  She will spend five to fifteen
4    minutes and then will take a break.  (AR 77.)  She will take a five minute break to see if she gets
5    more energy.  (AR 77.)  Sometimes Plaintiff will nap from midnight to 4 a.m. depending on how
6    tired she is.  (AR 77.)  She will nap if she is not up to replying to text messages, listening to
7    music or watching a video or interactions.  (AR 78.)  If there is nothing to do, she will nap.  (AR
8    78.)  She naps two days a week for about two hours.  (AR 78.)

9    Most of the day, Plaintiff is resting.  (AR 78.)  She spends most of her day sitting or lying
10   in bed.  (AR 79.)  On a bad day, she will spend ten to ten and a half hours in bed.  (AR 79.)  On a
11   good day, she will spend seven hours in bed.  (AR 79.)  She will have one or two good days a
12   week.  (AR 79.)  The rest of the week is anywhere from a bad day to something in-between.
13   (AR 79.)

14   Plaintiff has pain in her shoulders, neck, jaw, head, mid-back, and low back.  (AR 79.)
15   Plaintiff has pain eighty to ninety percent of the time.  (AR 80.)  Plaintiff takes naproxen sodium
16   and extra strength Tylenol for her pain, and low dose naltrexone preventively.  (AR 80.)  The
17   medications help her pain, but do not take it away completely.  (AR 80.)  When Plaintiff takes
18   Tylenol at the prescribed dose it caused her liver enzymes to go up so she had to back off of
19   Tylenol.  (AR 80.)  Naproxen or ibuprofen cause her stomach irritation and gastrointestinal
20   cramping and irritates her irritable bowel syndrome.  (AR 80.)

21   Plaintiff has muscle tension one day a week, but has it to some degree all the time but
22   sometimes it will cause her to lie around for two or three days out of the week.  (AR 81.)  When
23   it is hot, she does not feel well and her carpal tunnel is worse.  (AR 82.)  She can stand for
24   shorter periods of time when it is hot.  (AR 82.)  When she has an episode of postural orthostatic
25   tachycardia syndrome ("POTS") her heart will race which is fatiguing.  (AR 82.)  She will feel hot
26   and sweat more.  (AR 82.)  If she stands once she starts getting these warning signs, she will get
27   nausea and a headache and trouble focusing if she is upright.  (AR 82.)  It lasts until she lays or
28   sits down and puts her feet up.  (AR 82.)  It will take a while for the racing to slow down and she

1   will sometimes have to stay lying down for an hour before she can sit up.  (AR 83.)  She always

2   has POTS but there are sometimes where it flares up and is more severe.  (AR 83.)  The two

3   weeks before her period she has to mostly lie horizontally.  (AR 83.)  Sometimes it keeps going

4   and when she is in a lower ebb, the weather changes and it is getting hotter, she will have to

5   remain lying down for longer.  (AR 83.)  She has had this go on for two months at a time.  (AR

6   83.)  She has been having the problem for three weeks and stated she was having trouble

7   focusing sitting up during the hearing.  (AR 83.)

8        Plaintiff can sit for fifteen minutes before she needs to adjust.  (AR 81.)  She can stand

9   from five to fifteen minutes.  (AR 81.)  She can walk one small city block on a bad day and on a

10  good day two.  (AR 81.)  Plaintiff can lift fifteen pounds but her shoulders hurt.  (AR 81.)  She is

11  able to carry a gallon of water in each hand, but her shoulders will hurt afterward.  (AR 81.)

12       Plaintiff has had hundreds of blood tests and has been seeing a specialist but there is no

13  formal diagnosis yet.  (AR 91.)

14       Plaintiff cannot currently pursue going to medical school.  (AR 93.)  But she wants to be

15  on the front lines helping this patient community when an FDA approved drug or treatment

16  comes along.  (AR 93.)  There is no test to diagnose this condition which is a neuro-endocrine-

17  immune disorder.  (AR 93, 96.)  It is a diagnosis of exclusion.  (AR 94.)  Plaintiff had a one day

18  test when she was feeling better and her test results were below average, her body does not

19  produce energy well.  (AR 94.)  Plaintiff wants to go to a specialist in Arizona, but does not have

20  the finances.  (AR 95.)

21       Dennis Tatum, Plaintiff's father also testified at the hearing.  (AR 84-93.)  Plaintiff will

22  have post exertional malaise which will take her out of circulation and she may or may not be

23  able to do anything for two or three days.  (AR 84.)  Plaintiff has lived with him her whole other

24  than one year when she was doing better.  (AR 86.)  Plaintiff lives with him and his wife.  (AR

25  86.)  Plaintiff is dysfunctional.  (AR 86.)  She has great fatigue.  (AR 87.)  She will say that she

26  cannot do something.  (AR 87.)  Plaintiff rests around the house most of the time.  (AR 87.)  She

27  naps when she needs to nap and otherwise is sitting or lying in bed most of the day.  (AR 87.)

28  He will help her by making her tea, taking her places she needs to go, washing her dishes, doing

1  some shopping, or cooking.  (AR 87.)  He will go to the store to get Plaintiff's medication.  (AR

2  87.)  She does not drive very often and then only for brief periods.  (AR 87-88.)  He will take her

3  to doctor's appointments.  (AR 88.)  He or his wife used to have to help her wash her hair, but

4  they have a chair she can sit in the shower if she needs to.  (AR 88.)  They have had the chair a

5  couple months.  (AR 88.)  She has never fallen in the shower.  (AR 88.)  She is able to anticipate

6  when she is going to have a problem and will deal with it before she has a problem.  (AR 89.)

7      She has brain fog and sometimes will state that something does not come to mind, or she

8  cannot think of it, or that she cannot deal with something right now.  (AR 89.)  They do not talk

9  that often and when they do they visit.  (AR 89.)  When she has a POTS episode, her blood

10  pressure will be all over the place.  (AR 89-90.)  She will get faint, tired, and says she has to sit

11  down.  (AR 90.)  She has a lack of energy and hot flashes.  (AR 90.)  She does not handle the

12  heat well and has to stay indoors or in a good air conditioned car if they go anywhere.  (AR 90.)

13      **B.      ALJ Findings**

14      The ALJ made the following findings of fact and conclusions of law.

15  • Plaintiff has not engaged in substantial gainful activity since the application date of July

16      18, 2014.

17  • Plaintiff has the following severe impairments: fibromyalgia, history of Scheuermann's

18      kyphosis, chronic fatigue/pain syndrome, somatoform disorder, and learning disability.

19  • Plaintiff does not have an impairment or combination of impairments that meets or

20      medically equals the severity of one of the listed impairments.

21  • Plaintiff has the residual functional capacity to perform sedentary work as defined in 20

22      C.F.R. § 416.967(a) except she must be able to rest every two hours for 15 minutes

23      falling within the normal break and lunches.  She can never have exposure to hazardous

24      work environments such as working at unprotected heights, operating fast or dangerous

25      machinery, or driving commercial vehicles.  In addition, she is limited to non-complex,

26      routine tasks in a static work environment.

27  • Plaintiff has no past relevant work.

28  • Plaintiff was born on February 27, 1992, and was 22 years old, which is defined as a

6

younger individual age 18-44, on the date the application was filed.

- Plaintiff has at least a high school education and is able to communicate in English.
- Transferability of job skills is not an issue because Plaintiff does not have past relevant work.
- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform.
- Plaintiff has not been under a disability as defined in the Social Security Act, since July 18, 2014, the date the application was filed.

(AR 22-31.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.

Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.

Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.

Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not,

1   proceed to step five.

2   Step five: Does the claimant's RFC, when considered with the claimant's age,
    education, and work experience, allow him or her to adjust to other work that
3   exists in significant numbers in the national economy? If so, the claimant is not
    disabled. If not, the claimant is disabled.
4
    Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).
5
6       Congress has provided that an individual may obtain judicial review of any final decision

7   of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).

8   In reviewing findings of fact in respect to the denial of benefits, this court "reviews the

9   Commissioner's final decision for substantial evidence, and the Commissioner's decision will be

10  disturbed only if it is not supported by substantial evidence or is based on legal error."  Hill v.

11  Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).   "Substantial evidence" means more than a

12  scintilla, but less than a preponderance.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996)

13  (internal quotations and citations omitted).  "Substantial evidence is relevant evidence which,

14  considering the record as a whole, a reasonable person might accept as adequate to support a

15  conclusion."  Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of

16  Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

17      "[A] reviewing court must consider the entire record as a whole and may not affirm

18  simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting

19  Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  However, it is not

20  this Court's function to second guess the ALJ's conclusions and substitute the court's judgment

21  for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

22  susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

23  upheld.").

        **IV.**

24      **DISCUSSION AND ANALYSIS**

25      Plaintiff contends that the ALJ erred by failing to call a vocation expert to testify at step

26  five; by failing to find her POTS diagnosis severe at step two; by failing to provide controlling

27  weight to the opinion of her treating physician; and by not providing clear and convincing

28

1   reasons to reject her symptom testimony.[2]

2       **A.    Medical Evidence Considered by the ALJ**

3       The ALJ considered that Plaintiff had sought treatment for complaints of chronic fatigue

4   as early as January 2008.  (AR 26, 448.)  Her doctor at the time expressed that he was very

5   concerned that Plaintiff was not returning to school for physical, as well as mental and social

6   reasons.  (AR 448.)

7       Plaintiff had a scoliosis study on September 9, 2009, that showed no significant

8   abnormalities with respect to the cervical, thoracic, and lumbar spine.  (AR 26, 2155.)  On May

9   26, 2009, Plaintiff had an MRI scan of the cervical spine that showed no significant abnormality.

10   (AR 26, 2145.)

11       The ALJ also considered that medical records in 2010 show she has a history of

12   Scheuermann's kyphosis, a form of juvenile osteochondrosis of the spine that is self-limiting

13   after growth is complete.  She did not have any pain currently or in the past, but rather had a

14   burning type sensation on her skin that was now completely gone.  (AR 26, 485.)  The ALJ

15   found that that condition appears to have run its course without further complication.  (AR 26.)

16       On July 8, 2010, Plaintiff consulted with a pediatric rheumatologist for a history of

17   fibromyalgia.  (AR 26, 467.)  Plaintiff had decided not to go ahead with surgical treatment for

18   some of her ailments, had received physical therapy, was seen by a chiropractor, and noted a

19   significant improvement in her energy level as well as the frequency of her fatigue.  (AR 467.)

20   Plaintiff reported that she was attending junior college and her fatigue was not particularly

21   limiting her ability to perform in her classes.  (AR 468.)

22       Plaintiff had a June 28, 2011 neurological consultation with Dr. Miller in which he stated,

23   "Ms. Tatum has had a course since about age fourteen of waxing and waning difficult to identify

24   medical problems characterized at times as 'viral' or fibromyalgia."  (AR 26, 856.)  He noted

25   that her presentation had a "marked somatoform flavor." (AR 26, 860.)  Dr. Miller continued to

26   note the marked somatoform flavor at subsequent visits.  (AR 26.)  On September 20, 2012, Dr.

27

28   [2] The Court has carefully considered the arguments and issued raised by Plaintiff and only addresses those arguments found to be necessary to render a decision in this matter.

1   Miller noted Plaintiff had widespread complaints.   (AR 585.)   Plaintiff reported that her

2   fibromyalgia was interfering with her work.  (AR 585.)  She had sore, aching, burning sensations

3   that are body wide and a sense of brain fog.  (AR 585.)  On examination, Plaintiff had diffuse

4   tenderness; cranial nerve function was normal; and station and gait were normal.  (AR 585.)

5        Plaintiff saw Dr. Miller on February 6, 2014, with widespread complaints of total body

6   achiness.  (AR 26, 852.)  Although she expressed a wide range of complaints, she refused to take

7   any medications for them.  (AR 852.)  On examination, she had pressured speech and was very

8   slender.  (AR 852.)  She was noted to be bright, affable, fluent, cogent and oriented.  (AR 852.)

9   Range of affect was normal with overriding somatic preoccupation.  (AR 852.)  Station and gait

10  were normal.  (AR 852.)

11       On August 6, 2014, Plaintiff saw Dr. Miller and again alleged a very wide ranging set of

12  complaints.   (AR 26, 851.)   Examination notes "symptoms are explained with *la belle*

13  *indifference*."   (AR 851.)   Assessment notes somatoform presentation and diffuse

14  musculoskeletal complaints.  (AR 851.)

15       Plaintiff saw Dr. Miller on September 25, 2014, and described widespread migratory

16  complaints that were so severe she had to drop out of school.  (AR 26, 1398.)  But, she had

17  managed to go to Costa Rica and engage in other foreign travel.  (AR 1398.)  She discussed that

18  she was angry with Dr. Mackey who she had seen at USCF who had opined that she was not as

19  ill as she felt and expressed that very few doctors understand chronic fatigue syndrome.  (AR

20  1398.)  She presented with a stack of "scientific" papers describing her illness.  (AR 1398.)  She

21  reported that she believed she had myalgic encephalomyelitis and chronic fatigue.  (AR 1398.)

22  Dr. Miller noted "Ms. Tatum's complaints are interfering with her schooling. which can be

23  viewed as both her vocation and her  avocation.  In short, the severity is reminiscent of a

24  personality disorder." (AR 1398.)  Dr. Miller also stated, "I am encouraged she is at least seeing

25  Dr. Stone who, while open to alternative medicines, does an excellent job of protecting her

26  patients from harm by fringe providers."  (AR 1398.)

27       On February 12, 2015, Plaintiff saw Dr. Miller who noted "Ms. Tatum is very upset that I

28  feel she has a somatization disorder and brought her father in for support to argue that she has the

1   condition."  (AR 26, 1401.)  He was unable to obtain an examination due to her upset.  (AR

2   1401.)  Dr. Miller noted, "Ms. Tatum's history strikes me as being more appropriate for somatic

3   symptom disorder.  That she has had such a strong emotional response to an alternative diagnosis

4   is most consistent with a condition that is 'heavily guarded' in psychiatric terms.  If she thought

5   the diagnosis of somatic symptom disorder was simply wrong and nonsensical, she would

6   respond in the same way as if I had diagnosed two broken legs, which is to say to laugh and not

7   come back.  The importance of her effort to convince me of her symptoms, which really means

8   to keep herself convinced, argues strongly for somatic symptom disorder."  (AR 1401.)

9       The ALJ noted that since the alleged onset date, Plaintiff has continued to seek treatment

10  for various symptoms, but clinical and diagnostic evidence has been largely unremarkable.  (AR

11  26.)  For instance, Plaintiff was seen in the emergency room on October 20, 2014, for abdominal

12  pain and palpations, but work-up showed no significant abnormality and did not reveal etiology.

13  (AR 26, 1140.)  Physical examination was unremarkable.  (AR 1140-1141.)  Her workup did not

14  reveal any etiology for acute worsening of her chronic pain and her EKG showed no significant

15  abnormalities.  (AR 1142.)  The ALJ also considered the following medical appointments.

16      Plaintiff had physical therapy on May 22, 2014, and reported that she was not getting into

17  physical therapy due to the stress of finals and lack of energy to do more than one thing at a time.

18  (AR 26, 1474.)  She was able to light chores like taking out the garbage and cooking for herself,

19  but was still not driving.  (AR 1474.)

20      Plaintiff went to physical therapy on May 26, 2014, and reported that she was doing some

21  of her exercises, but had to be careful or her mid back would get sore.  (AR 26, 1472.)  She was

22  doing light chores at home like emptying the garbage and cooking for herself, but was still not

23  driving because it took all her energy.  (AR 1472.)

24      Plaintiff was seen on June 8, 2014, after returning from a two week trip to Costa Rica

25  complaining of a sore throat.  (AR 26, 1635.)  Plaintiff had a generally normal physical

26  examination other than some throat redness.  (AR 1636.)  She was offered an antibiotic but

27  declined until throat culture results were received.  (AR 1636.)

28      Plaintiff was seen on June 10, 2014, complaining that her sore throat was worse.  (AR 26,

1775.)  She had started taking an old prescription of amoxicillin the prior day, but it had not
helped.  (AR 1775.)  Plaintiff had a generally normal examination, other than some neck
tenderness and a large left tonsil.  (AR 1775.)  Plaintiff was told not to take old medications and
was given a prescription for Cipro.  (AR 1775.)

On August 20, 2014, Plaintiff was seen in the emergency room complaining of throat
pain, weakness and a poor appetite for several months that come and go and had begun again
three days prior.  (AR 26, 1669.)  Physical examination was generally unremarkable.  (AR 1669-
1670.)  It was noted that she was difficult to direct but the doctor was able to get the pertinent
complaints.  (AR 1670.)  She had a follow up with the ear, nose, and throat doctor that same day
and was to discuss having a tonsillectomy.  (AR 1670.)

Plaintiff saw Dr. Tais on September 22, 2014, for a new patient consult.  (AR 26, 1391.)
Plaintiff complained of having pain all over and being too tired to go to school.  (AR 1391.)  She
stated that amitryptiline did not help.  (AR 1391.)  Physical examination was unremarkable.  (AR
1391.)

On October 2, 2014, Plaintiff was seen by Dr. Stone complaining of flu like symptoms
for days.  (AR 26, 1389.)  Plaintiff tried pristique for pain relief and it made her sick.  (AR
1389.)  Plaintiff suggested that her hormones might be affecting her pain.  (AR 1389.)  Plaintiff
had an unremarkable physical examination.  (AR 1390.)  She was to use supplements for her
chronic fatigue syndrome, pain, and digestion.  (AR 1390.)

On October 16, 2014, Plaintiff was seen by Dr. Stone complaining of burping and nausea.
(AR 26, 1388.)  The record notes that of the multiple suggestions that were given to her she
started LDN on October 6 and was having less pain.  (AR 1388.)  Plaintiff reported feeling
spacy, dizzy, and panicky.  (AR 1388.)  She had not started the methyguard yet.  (AR 1388.)
Plaintiff had an unremarkable physical examination.  (AR 1388.)  Plaintiff was advised to
consider liposomal glutathione.  (AR 1388.)  Plaintiff was to take DGL prior to each meal and
once the burning was improved to start 1 tablespoon of apple cider vinegar.  (AR 1389.)

Plaintiff was seen in the emergency room on October 20, 2014, complaining of
abdominal pain, headache, and dizziness.  (AR 26, 1413.)  Physical examination was

1    unremarkable.  (AR 1413-1414.)  She was diagnosed with abdominal pain, unknown cause.  (AR

2    1415.)

3       Plaintiff saw Dr. Stone on October 31, 2014, for a follow up.  (AR 26, 1386.)  Plaintiff

4    reported that "DGL has been very helpful."  (AR 1386.)  It was suggested that she take salt and

5    sugar and she was given a prescription for florinef.  (AR 1386.)  It is noted that Plaintiff was

6    using less ibuprofen on the naltrexone which must be helping her pain.  (AR 1386.)  Physical

7    examination was unremarkable.  (AR 1387.)  It was suggested that Plaintiff try thymuril and

8    information was provided on how to obtain the supplement.  (AR 1387.)  Plaintiff was advised

9    that Dr. Stone did not see any clear benefit from the supplements that Plaintiff had on a list.  (AR

10    1387.)

11       On November 11, 2014, Plaintiff saw Dr. Stone to review test results.  (AR 26, 1385.)

12       Plaintiff saw Dr. Tais on November 24, 2014, for a Meyer's vitamin infusion.  (AR 26,

13    1384.)  On physical examination, she was noted to be very upbeat and talkative.  (AR 1385,

14    1386.)  Her adrenal rhythm was noted to be low, otherwise examination was unremarkable.  (AR

15    1386.)  She was again recommended a Meyer's cocktail and no other interventions were

16    recommended as there were two others she had not started yet.  (AR 1386.)

17       On December 11, 2014, Plaintiff saw Dr. Stone and reported that she was using her

18    medication and her acne was better.  (AR 26, 1383.)  She thought it was helping her energy and

19    but she was still having hot flashes.  (AR 1383.)  She had increased tolerance for shopping but

20    was still complaining of paresthesias.  (AR 1383.)  Plaintiff had an unremarkable physical

21    examination.  (AR 1383.)

22       Dr. Stone saw Plaintiff on January 6, 2015, for a follow up and Plaintiff complained that

23    her acne was worse.  (AR 26, 1381.)  Plaintiff thought she might have congenital adrenal

24    hyperplasic.  (AR 1381.)  Her fatigue was reported to be stable and she was only now increasing

25    her naltrexone.  (AR 1381.)  Physical examination was normal, other than severe cystic acne of

26    the face.  (AR 1381.)  Plaintiff had normal and appropriate affect and normal gait.  (AR 1381.)

27       Plaintiff saw Dr. Stone on February 3, 2015 for a follow up.  (AR 26, 1380.)  She had not

28    yet tried vitamin A for her acne.  (AR 1380.)  She complained of being very tired and reported to

1  have lots of symptoms of low thyroid but had never been investigated.  (AR 1380.)  Plaintiff

2  complained of pain in her upper and lower back which has been helped by physical therapy in

3  the past.  (AR 1380.)  On physical examination, Plaintiff's neck muscles were tender but her

4  spine was okay.  (AR 1381.)

5      Plaintiff had a tilt table test on February 11, 2015, which Dr. Johnson found was positive

6  for POTS syndrome with an increase in heart rate both acutely and then overall as well as a drop

7  in blood pressure and with symptoms all consistent with this syndrome.  (AR 26, 1400.)

8      Plaintiff saw Dr. Stone on February 27, 2015 for lab results and was complaining of

9  vaginal irritation.  (AR 26, 1379.)  She requested tying IV fluids given her recent very positive

10  test for POTS syndrome.  (AR 1379.)  Plaintiff was noted to be fatigued with frustrated affect.

11  (AR 1380.)  Other than findings on pelvic examination, physical examination was within normal

12  limits.  (AR 1380.)

13     Plaintiff was seen for an initial physical therapy visit on March 3, 2015.  (AR 26, 1245,

14  1402.)  She reported that her symptoms got worse after she spent a couple weeks in Costa Rica

15  helping with a kids camp in May 2014.  (AR 1402.)  The flare up caused pain and fatigue that

16  manifested with infections and viruses.  (AR 1402.)  The neurologist gave her exercises to do but

17  they were too aggressive and put her over the edge.  (AR 1402.)  She was being seen for her

18  neck, jaw, and strengthening.  (AR 1402.)  Plaintiff reported that she only laid down a couple of

19  times a week during the day and pushed herself to keep going.  (AR 1402.)  She complained of

20  pain throughout her body.  (AR 1402.)  Range of motion in her cervical spine and shoulder was

21  within normal limits.  (AR 1403.)  Upper extremity strength was within normal limits she

22  complained of muscle soreness with resistance in all directions for her shoulders, neck and

23  hands.  (AR 1403.)  After being told that she might have some neural tension, she did not

24  complaint about any upper extremity pain.  (AR 1404.)  Plaintiff was not using any medication

25  for pain other than a low dose of Naltrexone.  (AR 1404.)

26     On April 7, 2015, Plaintiff was seen by Dr. Stone for a follow-up on her vaginitis and

27  abdominal pain.  (AR 26, 1250, 1378.)  Physical examination was unremarkable.  (AR 1378.)

28  Plaintiff was noted to have reported that she is taking more sodium and is feeling better and her

1   energy had improved also.  (AR 1378.)  She had physical therapy on this same date.  (AR 1406.)

2   Plaintiff reported that she was afraid of exercise because it causes a flare up and is finding that

3   she does better if she just does the exercises gently every day.  (AR 1406.)  Plaintiff's range of

4   motion in her cervical spine and shoulder was within normal limits, but she complained of some

5   lessening of tightness at the end range.  (AR 1407.)  Plaintiff reported that she had been able to

6   go shopping to pick up some things for Easter and did not need help lifting the bags that she had.

7   (AR 1408.)  Plaintiff had also walked doing some charity work with her mother, and had been

8   able to walk about a mile before she got sore and rode the rest of the way with her mother.  (AR

9   1408.)

10   On April 13, 2015, Plaintiff was seen by Dr. Tais for a follow-up on her vaginitis.  (AR

11   26, 1377.)  Physical examination was unremarkable other than vaginal discharge.  (AR 1377.)

12   Plaintiff saw Dr. Johnson on April 20, 2015.  (AR 26, 1410.)  Plaintiff complained of

13   occasional dizziness and stated that she had autonomic instability.  (AR 1410.)  She reported

14   pain in the lower abdomen and was almost sure that she had interstitial cystitis.  (AR 1410.)  The

15   record notes "suspect neurogenic syncope with moderate POTS all exaggerated by severe

16   anxiety with/without personality disorder?"  (AR 1410.)  Plaintiff refused to take Lexapro or

17   other medication for hypotension and was "Not taking florinef daily!!"  (AR 1410.)  Plaintiff had

18   a normal physical examination.  (AR 1410.)  The assessment notes "moderate POTS, severe

19   anxiety disorder that worsens symptoms of dizziness, poor compliance."  (AR 1410.)  Plaintiff

20   was advised to take florinef daily, and it was recommended to increase salt and water, drink

21   Gatorade or pickle juice as needed, consider Lexapro and consider more exercise and less

22   supplements.  (AR 1410-1411.)  Plaintiff was also to consider a psychological evaluation.  (AR

23   1411.)

24   Plaintiff was seen by nurse practitioner Simas on April 21, 2015 for a vaginal discharge

25   and itching and burning.  (AR 26, 1304.)  Physical examination was unremarkable, other than a

26   vaginal discharge.  (AR 1305.)  Plaintiff was oriented to person, place and time.  (AR 1305.)

27   Mood and affect were normal.  (AR 1305.)  She was diagnosed with acne, chronic fatigue

28   syndrome, and leukorrhea, vaginal, noninfectious, and was to start amitriptyline for chronic

15

1  fatigue syndrome.  (AR 1305.)

2      Plaintiff had physical therapy on May 29, 2015, and complained that she had her braces

3  tightened and her mouth was a little sore. (AR 1470.)  She was doing some exercises with the

4  foam roller to keep her spine looser because that was where she was feeling the most tightness.

5  (AR 1470.)

6      Plaintiff was seen for physical therapy on June 3, 2015, and reported being very fatigued

7  after going to the coast for two days.  (AR 26, 1468.)  She complained that her jaws were still

8  sore from the adjustment to her braces.  (AR 1468.)

9      Plaintiff had physical therapy on June 8, 2015, for her neck and jaw and for

10  strengthening.  (AR 16, 1464.)  Plaintiff reported that she was afraid of exercise, but is finding

11  she is better a couple days later if just does the exercises gently every day.  (AR 1464.)  Cervical

12  and shoulder range of motion was within normal limits.  (AR 1465.)

13      On August 13, 2015, Plaintiff had a comprehensive psychological examination by Dr.

14  Ahmadshahi, which is discussed in detail below.  (AR 26, 1453-1461.)

15      Plaintiff was seen by Dr. Schlief on November 13, 2015, complaining of muscle spasms,

16  especially in her back and neck.  (AR 26, 1773.)  Physical examination was unremarkable.  (AR

17  1773.)  She was requesting a muscle relaxer.  (AR 1773.)  She was prescribed Flexeril and was

18  to follow up with her primary care physician.  (AR 1773.)

19      On March 30, 2016, Plaintiff presented to the chiropractor reporting pain as a 5 on a scale

20  of 10 that had been present since March 29, 2016.  She stated the symptoms were present 60

21  percent of the day.  (AR 27, 1551.)  She stated that her tongue was numb and tingling the prior

22  day, and reported left front mid rib pain, upper right back pain, and left pain.  (AR 1551.)

23  Plaintiff had a mild to moderate decrease in range of motion of her cervical spine, and a mild

24  decrease in range of motion in the lumbar and thoracic spine.  (AR 1552.)  She reported that she

25  was able lift heavy objects off a table, could walk one half a mile, stand for an hour, sit for an

26  hour, and was able to travel anywhere with pain.  (AR 1555.)

27      On April 6, 2016, Plaintiff had chiropractic treatment and reported pain as a 4 on a scale

28  of 10 that was present sixty percent of the time and that her mid upper back and right shoulder

needed an adjustment.  (AR 27, 1548.)  Plaintiff had a mild to moderate decrease in range of motion of her cervical spine, and a mild decrease in range of motion in the lumbar and thoracic spine.  (AR 1549.)

Plaintiff had chiropractic treatment on April 13, 2016, and reported pain as a 4 on a scale of 10 that was present sixty percent of the time.  (AR 27, 1545.)  She stated that her upper to mid back and shoulders feel out of place and her rib cage and lower back were tight, and her hips were sore.  (AR 1546.)  Plaintiff had a mild to moderate decrease in range of motion of her cervical spine, and a mild decrease in range of motion in the lumbar and thoracic spine.  (AR 1546.)

Plaintiff presented for chiropractic treatment on December 21, 2016, complaining of pain that was a 4 on a scale of 10 that were present sixty percent of the day.  (AR 27, 1542.)  Plaintiff had mild to moderate decrease in the range of motion to the cervical spine; and mild decreases in range of motion to the lumbar and thoracic spine.  (AR 1542-1543.)

Plaintiff was seen on May 19, 2016 complaining of post nasal drip and episodes of dyspnea.  (AR 26, 1512.)  She had a cough and went to urgent care and was given Ventolin which she did not use.  (AR 1512.)  Physical examination was normal other than some nasal findings.  (AR 1513-1514.)

Plaintiff saw Dr. Peterson on June 28, 2016, with many complaints.  (AR 26, 1826.)  She reported some neurological complaints, some generalized malaise, and fatigability.  (AR 1826.)  She was scheduled for surgery in the near further was very concerned about her immune parameters.  (AR 1826.)  She had "many, many questions about her literature search and other issues with respect to her past medical history."  (AR 1826.)  Physical examination notes mild anterior and posterior adenopathy; mild acne; enlarged tonsils and somewhat cystic with exudate; lungs entirely clear; breasts and genitalia deferred; and abdomen nontender.  (AR 1826.)

On July 11, 2016, Plaintiff was seen by Dr. Peterson.  (AR 1820.)  Physical examination was normal.  (AR 26, 1821.)

On July 18, 2016, Plaintiff had a tonsillectomy and adenoidectomy.  (AR 26, 1818, 1863.)  Diagnosis on the pathology report for the right and left tonsils states, "benign tonsillar

1  tissue with lymphoid hyperplasia, bacterial colonies, focal acute inflammation, negative for

2  squamous dysplasia.  (AR 1862.)

3      On March 27, 2017, Plaintiff complained that she had developed a rash after taking

4  medication several days prior that cleared up when she took Benadryl.  (AR 1509.)  Physical

5  examination was unremarkable.  (AR 1510.)

6      Plaintiff was seen on March 30, 2017, complaining that she had a head cold the prior

7  month and was continuing to have an intermittent sore throat.  (AR 26, 1506.)  Physical

8  examination was unremarkable.  (AR 1507-1508.)

9      Plaintiff presented for chiropractic treatment on July 19, 2017.  (AR 27, 1538.)  She

10  described pain that was 4 on a scale of 10 that was present sixty percent of the day.  (AR 1538.)

11  She had a mild decrease in range of motion in her thoracic spine.  (AR 1539.)

12      On October 4, 2017, Plaintiff was seen complaining of pelvic pain for the past month.

13  (AR 26, 1500.)  Physical examination was unremarkable.  (AR 1501.)  Plaintiff declined

14  exploratory laparoscopy options or a gynecological consult and refused over the counter options.

15  (AR 1501.)

16      On September 13, 2017, Plaintiff was seen for a well woman examination.  (AR 26,

17  1503.)  Physical examination was unremarkable.  (AR 1504-1505.)

18      Plaintiff had a pelvic ultrasound on October 16, 2017, that found mildly enlarged left

19  ovary composed of a 2.6 cm solid component, and a 1.2 cm cystic component which may be

20  normal variation rather than neoplasm.  (AR 26, 1498.)  A follow-up ultrasound of the pelvis was

21  recommended in about two months for reevaluation.  (AR 1498.)  Unremarkable right ovary;

22  retroflexed uterus at the upper limits of normal size; and endometrium in the upper limits of

23  normal thickness.  (AR 1498.)

24      On October 19, 2017, Plaintiff was seen for results of a pelvic ultrasound.  (AR 26,

25  1496.)  Physical examination was unremarkable other than acne.  (AR 1497.)

26      **B.     Step Two**

27      Plaintiff contends that the ALJ erred by failing to find her POTS diagnosis severe at step

28  two.  Plaintiff argues that the ALJ found her POTS diagnosis not severe by relying on her own

1    misunderstanding of the condition.  Plaintiff asserts that the ALJ was confused and considered

2    the POTS diagnosis in conjunction with her other autoimmune disorders and her treating

3    physician determined that the POTS diagnosis and other impairments rendered her residual

4    functional capacity at a less than sedentary level.  Plaintiff argues that during the hearing, the

5    ALJ stated that she was unfamiliar with the diagnosis and exhibited confusion on whether it was

6    an immunology or hormonal diagnosis and that she was going to have to look at the evidence

7    more carefully and do outside research.  Plaintiff contends that this is an ambiguity that required

8    the ALJ to further develop the record.

9         Defendant counters that the ALJ properly determined that Plaintiff's POTS diagnosis was

10   not a severe impairment at step two.  Defendant contends that Plaintiff's physician identified the

11   symptoms of her fibromyalgia and POTS as cognitive disfunction, post-exertional malaise, pain,

12   and infections and that she had identified tender and trigger points, but then subsequently opined

13   that these were not applicable.  Defendant argues that the ALJ discussed Plaintiff's symptoms of

14   fatigue, pain, and feeling run down therefore any failure to find POTS severe at step two was

15   harmless.

16        In reply, Plaintiff reasserts the arguments in her opening brief.

17        "An impairment or combination of impairments can be found 'not severe' only if the

18   evidence establishes a slight abnormality that has 'no more than a minimal effect on an

19   individual['s] ability to work.' "  Smolen, 80 F.3d at 1290 (citations omitted).  Step two is a "de

20   minimis screening devise to dispose of groundless claims."  Id.  An ALJ can only find that

21   claimant's impairments or combination of impairments are not severe when her conclusion is

22   clearly established by medical evidence.  Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005)

23   (quoting S.S.R. 85-28).  In considering an impairment or combination of impairments, the ALJ

24   must consider the claimant's subjective symptoms in determining their severity.  Smolen, 80

25   F.3d at 1290.

26        Symptoms are not medically determinable physical impairments and cannot by

27   themselves establish the existence of an impairment.  Titles II & XVI: Symptoms, Medically

28   Determinable Physical & Mental Impairments, & Exertional & Nonexertional Limitations, SSR

1  96-4P (S.S.A. July 2, 1996).  In order to find a claimant disabled, there must be medical signs
2  and laboratory findings demonstrating the existence of a medically determinable ailment.  Id.
3  "[R]egardless of how many symptoms an individual alleges, or how genuine the individual's
4  complaints may appear to be, the existence of a medically determinable physical or mental
5  impairment cannot be established in the absence of objective medical abnormalities; i.e., medical
6  signs and laboratory findings .... In claims in which there are no medical signs or laboratory
7  findings to substantiate the existence of a medically determinable physical or mental impairment,
8  the individual must be found not disabled at step 2 of the sequential evaluation process."  Id.

9      The ALJ considered that in February 2015, a tilt table test was positive for POTS.  (AR
10  22, 1400.)  While Plaintiff reported feeling her best with florinef, salt, water, and Gatorade as
11  needed, a progress note in April 2015 stated that she was not taking the florinef daily as
12  prescribed.  (AR 22-23, 1949, 1959.)  Further, as of April 2017, Plaintiff had not had a POTS-
13  related near-syncope since July 2016.  (AR 22, 1949.)  The ALJ found that there was no
14  evidence that the condition caused more than a minimal functional limitation or had lasted more
15  than twelve months and was non-severe.  (AR 23.)

16      Further, the ALJ went on to consider Plaintiff's allegations of fatigue and pain, along
17  with the lack of objective findings and medical opinions in the record, and limited Plaintiff to
18  sedentary work.  (AR 25, 26.)  Any error in failing to find impairment severe at step two is
19  harmless where the ALJ considers the limitations posed by the impairment in the step four
20  analysis.  Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007)  The ALJ ultimately decided Step
21  Two in Plaintiff's favor, meaning she "could not possibly have been prejudiced" at this stage of
22  the analysis.  See Buck v. Berryhill, 869 F.3d 1040, 1049 (9th Cir. 2017).

23      Any error in finding Plaintiff's POTS diagnosis non-severe at step two would be
24  harmless error.

25      **C.    Physician Opinion**

26      Plaintiff contends that the ALJ erred by failing to afford the greatest or controlling weight
27  to the opinion of her treating physicians, Dr. Stone and Peterson, who both found that she was
28  unable to sustain even sedentary work eight hours a day, five days per week.  Plaintiff argues

1   that the ALJ failed to provide specific and legitimate reasons to reject the opinions.  Plaintiff

2   asserts that the record is replete with testing which ruled out other diagnoses and the ALJ

3   exhibited a misunderstanding of her complex and interrelated conditions.

4          Defendant counters that the ALJ properly discounted Drs. Peterson and Stone's opinions

5   regarding Plaintiff's allegedly disabling limitations.  Defendant argues that the ALJ gave legally

6   valid reasons to reject the opinions of Plaintiff's treating physicians by finding that the objective

7   findings in the record did not corroborate their conclusions about her limitations and that Dr.

8   Stone's opinion was inconsistent with his own treatment notes.

9          In reply, Plaintiff reasserted the argument in her opening brief.

10          The weight to be given to medical opinions depends upon whether the opinion is

11   proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d

12   821, 830-831 (9th Cir. 1995).  "Generally, the opinions of examining physicians are afforded

13   more weight than those of non-examining physicians, and the opinions of examining non-

14   treating physicians are afforded less weight than those of treating physicians.  Orn v. Astrue, 495

15   F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)-(2)).  "If a treating or

16   examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject

17   it by providing specific and legitimate reasons that are supported by substantial evidence."

18   Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)(3)).  The

19   contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific,

20   legitimate reason for rejecting a treating or examining physician's opinion, however, "it may

21   constitute substantial evidence when it is consistent with other independent evidence in the

22   record."  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  The ALJ need not accept

23   the opinion of any physician that is brief, conclusory, and unsupported by clinical findings.

24   Thomas, 278 F.3d at 957.

25          To the extent that Plaintiff is asserting that the ALJ erred in rejecting the opinion that

26   Plaintiff could not sustain even sedentary work activity, under the regulations, a medical opinion

27   is a statement from an acceptable medical source that reflects judgment about the nature and

28   severity of the claimant's impairments.  20 C.F.R. § 404.1527(a)(1).  Opinions on some issues

1   are not medical opinions, but are opinions on issues reserved for the Commissioner.  20 C.F.R. §

2   404.1527(a)(1).  One such issue is that the claimant is "disabled" or "unable to work."  20 C.F.R.

3   § 404.1527(d)(1).  The ALJ does not give any special significance to opinions on issues that are

4   reserved for the Commissioner.  20 C.F.R. § 404.1527(d)(3).  Here, the ALJ considered the

5   medical records of Plaintiff's treating providers and the limitations opined, and to the extent that

6   Plaintiff is challenging the ALJ's rejection of Drs. Peterson and Stone's opinion that Plaintiff

7   was unable to work, the Court finds no error.

8           1.    Medical Opinions

9           The ALJ considered the following medical opinions.

10          In terms of the Plaintiff's alleged mental symptoms, the ALJ considered that in 2009, she

11  had qualified for learning disability services in math and for timed tests.  (AR 26, 800.)

12          The ALJ gave little weight to a May 2016 statement by Dr. Stone that Plaintiff be

13  excused from jury duty for one year due to medical reasons and a February 7, 2017 note that

14  Plaintiff was unable to work for two years due to medical reasons as there is no explanation as to

15  what informed these limitations.  (AR 28, 1910, 1917.)

16          The ALJ considered the October 22, 2016 opinion of Dr. Stone.  (AR 27, 1880-1882.)

17  Dr. Stone had been seeing Plaintiff for two years and six months and had seen her for sixteen

18  office visits.  (AR 1880.)  Plaintiff was diagnosed with chronic fatigue syndrome and she had

19  symptoms of pain, dizziness, fatigue, and neuropathy in the feet.  (AR 1880.)  When asked to

20  characterized Plaintiff's pain, Dr. Stone stated, "Generalized, she can tell you."  (AR 1880.)  She

21  did not identify any clinical findings or objective signs.  (AR 1880.)  Plaintiff did not have any

22  side effects from her medication that would preclude her working.  (AR 1880.)  Dr. Stone stated

23  that Plaintiff's impairments would be expected to last twelve months and her emotional factors

24  do not contribute much to her symptoms and functional limitations.  (AR 1880.)  Plaintiff was

25  able to one city block without rest or severe pain; could sit forty-five minutes at one time, stand

26  for 15 minutes at one time, and sit, stand/walk less than 2 hours in an 8 hour workday.  (AR

27  1881.)  To some extent Plaintiff would need to take unscheduled breaks every 30 to 45 minutes

28  and would have to rest for 15 minutes before returning to work due to chronic fatigue and

pain/paresthesias/numbness.  (AR 1881.)  Plaintiff did not need to elevate her legs with prolonged sitting.  (AR 1881.)  Plaintiff could occasionally lift 10 pounds; rarely lift 20 pounds; and never lift 50 pounds.  (AR 1882.)  She could frequently crouch or squat; occasionally twist, stoop, and climb stairs; and never climb ladders.  (AR 1882.)  Plaintiff had no significant limitations in her ability to reach, finger, or handle.  (AR 1882.)  Plaintiff would be off task 25 percent or more of a typical workday due to symptoms severe enough to interfere with the attention and concentration needed to perform simple work tasks.  (AR 1882.)  Plaintiff was capable of low stress work.  (AR 1882.)  Her impairments were likely to produce good and bad days.  (AR 1882.)  Dr. Stone checked the box stating that Plaintiff's impairments were demonstrated by signs, clinical findings, and laboratory or test results, but did not identify any such signs, clinical findings, or laboratory or test results.  (AR 1882.)

The ALJ considered that Dr. Peterson completed a physical medical source statement on March 27, 2018.  (AR 28, 2126-2129.)  Dr. Peterson had been treating Plaintiff for three plus years.  (AR 2126.)  Plaintiff was noted to have had symptoms for greater than five years.  (AR 2126.)  Her symptoms were cognitive disfunction; post-exertional malaise; widespread pain, and recurrent infections.  (AR 2126.)  Plaintiff's pain was characterized as headaches, widespread whole body pain, and TMJ.  (AR 2126.)  The clinical findings and objective signs were noted to be multiple tender and trigger points.  (AR 2126.)  She was noted to have failed all symptomatic therapies to date.  (AR 2127.)  Plaintiff's impairments were expected to last at least twelve months, but emotional factors did not affect the severity of her symptoms or emotional limitations.  (AR 2127.)  Plaintiff had anxiety and chronic pain syndrome.  (AR 2127.)  Despite stating that the objective findings to support the limitations were tender points, Dr. Peterson contradictorily stated that trigger points were not applicable and he did not identify any tender points.  (AR 2127.)

Dr. Peterson opined that Plaintiff could walk 2 to 3 city blocks; sit 30 minutes; stand for 10 minutes at one time; and sit and stand/walk for less than 2 hours in an 8 hour work day.  (AR 2127.)  He stated that exercise worsens her symptoms.  (AR 2127.)  Plaintiff would need to very frequently take unscheduled breaks and would have to rest for fifteen minutes due to muscle

1  weakness, chronic fatigue, and pain/paresthesias, numbness.  (AR 2127.)  Plaintiff does not need

2  to elevate her legs while sitting.  (AR 2127.)  She does not need to use an assistive device to

3  ambulate.  (AR 2128.)  Plaintiff can occasionally lift less than ten pounds and can never lift ten

4  pounds or more.  (AR 2128.)  She can never stoop/bend, crouch/squat, or climb ladders; and can

5  rarely twist or climb stairs.  (AR 2128.)  Dr. Peterson stated that Plaintiff had no significant

6  limitations in reaching, handling or fingering.  (AR 2128.)  But inconsistently opined that

7  Plaintiff can only grasp, turn or twist objects five percent of the time, reach in front of her body

8  for five percent of the time, and can never reach overhead.  (AR 2128.)  Plaintiff was likely to be

9  off task for twenty-five percent or more of the day due to symptoms that were severe enough to

10  interfere with concentration and attention.  (AR 2128.)  Plaintiff is incapable of even low stress

11  work because stress and exertional activity worsen her symptoms.  (AR 2128.)  Plaintiff's

12  impairments are likely to produce good and bad days.  (AR 2128.)  Plaintiff would miss more

13  than four days per month due to her impairments or treatment.  (AR 2128.)  Dr. Peterson stated

14  that Plaintiff's impairments were demonstrated by signs, clinical findings, and laboratory or test

15  results, but did not identify any.  (AR 2128.)  He stated the limitations have persisted for the past

16  five years.  (AR 2128.)

17       The ALJ provided no weight to the March 2018 disabled defendant certification to Blue

18  Cross provided by Dr. Peterson because it was based on the previous therapists assessment and

19  was on an opinion reserved for the Commissioner.  (AR 28.)  On March 6, 2018, Dr. Peterson

20  completed the certification stating "per previous the patient is disabled and dependent totally at

21  present.  She is having exploratory surgery & suffers chronic mental problems."  (AR 2005.)  He

22  opined that Plaintiff was disabled for one year.  (AR 2005.)

23       The ALJ also provided no weight to an undated medical disability verification form

24  signed by Plaintiff's family physician that she is permanently disabled due to chronic fatigue

25  from fibromyalgia and chronic fatigue as it is an opinion on an issue reserved for the

26  Commissioner.  (AR 28.)  On October 4, 2010, Dr. Shannon completed a medical-disability

27  verification form for the State Center Community College District.  (AR 811.)  Dr. Shannon

28  stated that Plaintiff had fibromyalgia and chronic fatigue and had functional limitations of

1  extreme fatigue.  (AR 811.)  He stated that Plaintiff's disabilities were permanent and chronic.

2  (AR 811.)  Plaintiff did not need any special assistance and did not need a disabled parking

3  permit.  (AR 811.)

4    The ALJ gave little weight to the October 2014 opinion of Plaintiff's orthodontist, Dr.

5  O'Hara, that Plaintiff can carry out all physical and mental activities with no limitations finding

6  it to be based on a one time evaluation for reported TMJ disorder and unsupported.  (AR 28.)  On

7  October 6, 2014, Dr. O'Hara wrote a letter stating that he had treated Plaintiff in 2012 for an

8  overbite and pain in her jaw.  (AR 1109.)  She had been a previous orthodontist patient and

9  underwent treatment for TMD with Dr. Woods.  (AR 1109.)  Orthodontic appliances were stated

10  on March 11, 2013.  (AR 1109.)  Dr. O'Hara examined Plaintiff on October 6, 2014, and found a

11  mild class III overjet and overbite that were edge to edge.  (AR 1109.)  Arch lengths were

12  adequate and open bite was minimal half a millimeter later incisor to lateral incisor.  (AR 1109.)

13  Dr. O'Hara opined that Plaintiff can carry out all physical and mental activities with no

14  limitations.  (AR 1109.)  He found her to be an intelligent and robust young woman who should

15  have no difficulty with school, work or anything else she chose to accomplish.  (AR 1109.)

16    The ALJ gave little weight to an April 2014 statement by a doctor at Fresno State Student

17  Heath Center because it is unclear whether the doctor ever treated Plaintiff, the notes do not

18  relate an opinion to either objective findings or specific clinical observations, the form was

19  permissibly rejected as a check-off report that did not contain any explanation for the basis of its

20  conclusions, and as of September 2014, Plaintiff was still attending college and subsequently

21  obtained her bachelor's degree.  (AR 28.)  On April 29, 2014, after she was seen in the health

22  clinic and at Plaintiff's request, Dr. Avila completed a form stating that from April 29, 2014

23  through May 16, 2014, Plaintiff had a medical condition that merits modification from class and

24  a serious and compelling medical condition which merits consideration for incomplete in her

25  courses.  (AR 1929.)

26    The ALJ gave little weight to the March 27, 2018 mental medical source statement of Dr.

27  Peterson.  (AR 29.)  On March 27, 2018, Dr. Peterson completed a mental medical source

28  statement.  (AR 2130-2131.)  He opined that Plaintiff's impairments did not preclude her from

understanding and remembering very short simple instructions; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; being aware of normal hazards and taking appropriate precautions; interacting appropriately with the general public; maintaining socially appropriate behavior; adhering to basic standards of neatness and cleanliness; and using public transportation.  (AR 2130-2131.)   He stated that traveling in unfamiliar places was not applicable.  (AR 2131.)  Plaintiff was precluded five percent of the time from carrying out very short and simple instructions, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, and responding appropriately to changes in the work environment.  (AR 2130.)  Ten percent of the time Plaintiff would be precluded from remembering work-like procedures, maintain attention for a two-hour segment, asking simple questions or requesting assistance, and accepting instructions and responding appropriately to criticism from supervisors.  (AR 2130.)  Fifteen percent of the time Plaintiff would be precluded from maintaining regular attendance and being punctual within customary, usual strict tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; and dealing with normal work stress.  (AR 2130.)  He stated, "Lives in hot environment public transport limited mobility."  (AR 2131.)  Plaintiff would be absent from work more than four days per month due to impairments or treatment.  (AR 2131.)  Her impairments were expected to last at least twelve months.  (AR 2131.)  Her impairments as demonstrated by signs, clinical findings, or test results is reasonably consistent with the limitations opined.  (AR 2131.)  Her limitations as opined have been present for many years.  (AR 2131.)

The ALJ gave varied weight to the opinions of the agency physicians.  The ALJ gave little weight to the opinion that Plaintiff was able to perform work at the medium exertional level because the agency physicians did not review the large number of records that were submitted at the hearing level and lacked evidence essential to accurately assess Plaintiff's physical abilities.  (AR 27.)  However, the ALJ did adopt the opinion at the reconsideration level that Plaintiff should avoid concentrated exposure to hazards as a reasonable precaution.  (AR 27.)  On

December 2, 2014, Dr. Nasrabadi reviewed the record and found that Plaintiff could occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; stand and/or walk 6 hours in an 8 hour workday; and was unlimited for push/pull.  (AR 138.)  Dr. Nasrabadi found no postural, manipulative, visual, communicative, or environmental limitations.  (AR 138.)

On reconsideration on September 29, 2015, Dr. Fast found that Plaintiff could occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; stand and/or walk and sit 6 hours in an 8 hour workday; and was unlimited for push/pull.  (AR 158.)  Dr. Fast opined that Plaintiff could occasionally climb stairs/ramps and ladders/ropes/scaffolds; frequently balance, stoop, kneel, crouch, and crawl.  (AR 158.)  Plaintiff had no manipulative, visual or communicative limitations.  (AR 158.)  She should avoid concentrated exposure to hazards.  (AR 159.)

Dr. Fast considered that Plaintiff alleges myalgic encephalomyelitis; fibromyalgia; IBS; TMJ; and Scheumann's kyphosis.  (AR 159.)  Plaintiff had a prior denial in March 2013.  (AR 159.)  Her activities of daily living show extreme exhaustion, she prepares simple meals, is too tired/weak to go out alone, handles money, and can walk 1 block or less.  (AR 159.)  The medical record shows a March 2011 MRI of the lumbar spine that was normal and an MRI of the thoracic spine showed mild posterior disk component at T 6-9.  (AR 159.)  In February 2013, Plaintiff had diffuse complaints with a diagnosis of fibromyalgia, and bouts of fatigue and weakness.  (AR 159.)  In August 2014, Plaintiff was diagnosed with fatigue syndrome.  (AR 159.)  The medical record at the reconsideration level shows Plaintiff has been complaining since age 14 of waxing and waning, difficult to identify medical problems, and has presentation with marked somatoform flavor.  (AR 159.)  In February 2015, Plaintiff was diagnosed with POTS syndrome with increase in heart rate both acutely and then overall as well as drop in blood pressure.  (AR 159.)  In March 2015, Plaintiff presented with forward head posture, rounded shoulders, scapular asymmetry, increased thoracic kyphosis, moderate muscle guarding, and tenderness throughout her body.  (AR 159.)  In April 2015, the record shows improved awareness of posture but she tends to over correct, moderate muscle guarding, tends to hold self very rigid, "FROM" cervical active range of motion but was reporting feeling some lessening of

tightness at end range, typical of systemic hypermobility.  (AR No. 159.)  The initial evaluation was for a medium RFC, but Dr. Fast recommend a medium RFC with environmental limits due to episodes of syncope and her positive POTS symptoms. (AR 159)

As to the mental aspects of work, the ALJ gave greater weight to the opinions of the agency physicians and assigned greater weight to the opinion on reconsideration that Plaintiff was able to perform non-complex routine tasks in a static work environment and gave less weight to the opinions that Plaintiff did not have significant mental functional limitations.  (AR 29.)

On November 11, 25, 2014, Dr. Aquino-Caro reviewed the record and found that Plaintiff did not have a severe mental impairment.  (AR 136.)

On July 6, 2015, Dr. Franco reviewed the record on reconsideration and Plaintiff was referred for a consultative psychological evaluation.  (AR 152.)  On September 30, 2015, Dr. Franco found that Plaintiff had mild restrictions of daily living and difficulties maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  (AR 156.)  Dr. Aquino-Caro considered that Dr. Miller treated Plaintiff with no formal diagnosis but did refer to somatic complaints/somatization with little objective evidence given. (AR 156.)  Dr. Peterson's records refer to cognitive dysfunction but Plaintiff had a normal MRI and there was no objective evidence as to what cognitive dysfunction would mean.  (AR 156.)  Dr. Stone's medical record did not contain treatment or cognitive allegations or observations.  (AR 156.) Plaintiff had cognitive testing in 2009 that showed low math skills.  (AR 156.)  There was no formal diagnosis and Plaintiff has not had any mental health treatment.  (AR 156.)  However, given her somatic complaints that were noted and the updated notes that refer to her having "marked malaise, fatigability and cognitive dysfunction" a consultative examination was obtained.  (AR 156.)  Plaintiff complained of anxiety, depression, and problems with attention and concentration.  (AR 156.)  Plaintiff had still not received any mental health treatment and her activities of living were limited due to her physical complaints.  (AR 156.)  Plaintiff had an anxious mood but was appropriate to context and mental status examination was unremarkable. (AR 156.)  Her WMS scores were all in the average-low average ranges and Trails within normal

1  limits.  (AR 156.)  Her mental status findings were mild and diagnosis was r/o unspecified

2  anxiety.  (AR 156.)

3      Dr. Franco found that Plaintiff did not evidence fatigue or lethargy during the interview

4  or testing and her performance on testing did not suggest any significant impairments.  (AR 156.)

5  As she had noted, the other doctors had not provided an actual mental diagnosis and there was no

6  objective evidence of cognitive dysfunction.  (AR 156.)  Dr. Franco opined that, giving Plaintiff

7  the benefit of the doubt, her symptoms are slightly more than severe and she is limited to simple

8  one to two step work; can maintain concentration, persistence, and pace for four hour increments

9  for an eight hour workday with customary work breaks, and can interact and adapt.  (AR 156.)

10      The ALJ also gave varied weight to the opinion of the consultative examiner.  (AR 29.)

11  The ALJ gave greater weight to the opinion that Plaintiff was able to perform non-complex

12  routine tasks in a static work environment, but less weight to the opinion that Plaintiff did not

13  have any significant mental limitations.  (AR 29.) On August 13, 2015, Plaintiff had a

14  comprehensive psychological examination by Dr. Ahmadshahi.  (AR 1453-1461.)  Plaintiff was

15  appropriately dressed for the examination and grooming was adequate.  (AR 1453.)  Posture and

16  gait were within normal limits.  (AR 1453.)  Plaintiff reported numerous physical illnesses and

17  feeling depressed and experiencing difficulty with memory and sleep; and anxiety and problems

18  with attention and concentration.  (AR 1454.)  She denied having a history of receiving mental

19  health services, outpatient psychiatric treatment, or taking psychotropic medication.  (AR 1454.)

20      Plaintiff reported that she had graduated from high school and had four years of college.

21  (AR 1455.)  Plaintiff lived with her family and was able to take care of her self-care and personal

22  hygiene.  (AR 1455.)  She stated that she does not drive, had never learned to drive, and does not

23  have a driver's license.  (AR 1455.)  She is able to handle her funds, but is not able to go out

24  alone due to her physical problems.  (AR 1455.)  She had a good relationship with family and

25  friends.  (AR 1455.)  Plaintiff was able to focus during the interview.  (AR 1455.)  She reported

26  difficulty completing household tasks due to physical illness, but no difficulty in making

27  decisions.  (AR 1455.)  On a daily basis, Plaintiff gets up in the morning, eats breakfast, checks

28  her email, makes phone calls, watches television and walks around the house.  (AR 1455.)

1    Plaintiff was able to volunteer information spontaneously, and there were no

2  psychomotor agitation or psychomotor retardation. (AR 1456.) Plaintiff appeared genuine and

3  truthful and there was no evidence of exaggeration or manipulation. (AR 1456.)

4    Thought processes were organized and coherent with no tangentiality. (AR 1456.) She

5  was not delusional and had no bizarre thought content. (AR 1456.) There was no psychotic

6  thought content. (AR 1456.) Plaintiff's mood was anxious and constricted and was congruent to

7  thought content. (AR 1456.) Speech was normal and clearly articulated with no stuttering,

8  stammering, dysarthria, or neologisms. (AR 1456.) Speech volume and rate was normal. (AR

9  1456.)

10    Plaintiff was alert and oriented to time, place, person, and the purpose of the evaluation.

11 (AR 1456.) She appeared to be of average intelligence. (AR 1456.) Digit span was 6 forward

12 and 4 backwards. (AR 1457.) She was able to recall three items immediately and two items

13 after five minutes. (AR 1457.) Plaintiff knew the name of the president and the capitals of the

14 United States and California. (AR 1457.) Plaintiff could not perform serial sevens. (AR 26,

15 1457.) But she was able to do simple math calculations and could spell "WORLD" forward and

16 backwards. (AR 26, 1457.) It was noted that she was able to follow this portion of the

17 examination well. (AR 1457.) Abstract thinking, judgment, and insight were intact. (AR 1457.)

18    Her scores on the Wechsler Memory Scale-IV placed her in the average to low average of

19 memory functioning. (AR 26, 1457-1458.) Plaintiff was diagnosed with r/o unspecified anxiety

20 disorder, and a current Global Assessment of Function ("GAF") Score[3] of 65.[4] (AR 1458.)

21    Dr. Ahmadshahi found that Plaintiff would be able to learn simple, repetitive tasks and

22 carry out one or two-step job instruction, and could likely perform detailed, varied, or complex

23 tasks. (AR 1459.) Her ability to concentrate and persist for extended period of time, appeared to

24  ────────────────────────

[3] "A GAF score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect

25  only to psychological, social, and occupational functioning, without regard to impairments in functioning due to
physical or environmental limitations." Cornelison v. Astrue, 2011 WL 6001698, at *4 n.6 (C.D. Cal. Nov. 30,

26  2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–
IV"), at 32 (4th ed. 2000)).

27  A GAF score of 61 to 70 indicates mild symptoms or some difficulty in social, occupational, or school functioning.
Macias v. Colvin, No. 1:15-CV-00107-SKO, 2016 WL 1224067, at *7 (E.D. Cal. Mar. 29, 2016).

28

1   be below average functioning.  (AR 1459.)  During the assessment, she demonstrated mild

2   impairment in sustaining attention and concentration.  (AR 1459.)  From an emotional and

3   psychological perspective, she presented with mild signs and symptoms of anxiety which could

4   impair her ability in her daily functioning.  (AR 1459.)  She would have mild impairment to

5   manage customary work stress and persist for regular workday.  (AR 1459.)  She had no history

6   of interpersonal difficulties and was socially appropriate during the examination.  (AR 1460.)

7   She had no difficulties in interacting appropriately with supervisors, coworkers, and peers on a

8   consistent basis.  (AR 1460.)

9        He opined that Plaintiff had no impairment in her ability to understand, remember and

10  carry out simple one or two-step instructions; to relate and interact with co-workers and the

11  public; and to accept instructions from supervisors.  (AR 1460.)  She was mildly impaired in her

12  ability to do detailed and complex instructions; to maintain concentration, persistence, and pace;

13  associate with day-to day work activity, including attendance and safety; to maintain regular

14  attendance in the workplace and perform work activities on a consistent basis; and to perform

15  activities without special or additional supervision.  (AR 1460.)

16       2.    Weight Provided to Treating Physician Opinions

17       Plaintiff only challenges the weight provided to the October 2016 medical source

18  statement from Dr. Stone (AR 1880-1883) and the March 27, 2018 medical source statement of

19  Dr. Peterson (AR 2126-2129) arguing that they should have been provided controlling weight.

20  Defendant counters that the ALJ properly identified good reasons that are supported by

21  substantial evidence to reject the opinions of Drs. Peterson and Stone finding that the objective

22  evidence did not corroborate their conclusions about Plaintiff's alleged disabling impairments,

23  were at odds with their treatment notes, and the basis for their conclusions was not explained in

24  the opinions.

25       A treating physician's opinion is entitled to controlling weight on the issue of the nature

26  and severity of the claimant's impairment where it is well-supported by medically acceptable

27  clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

28  evidence in the record.  20 C.F.R. § 404.1527(c)(2).  "If there is 'substantial evidence' in the

1    record contradicting the opinion of the treating physician, the opinion of the treating physician is

2    no longer entitled to 'controlling weight.' "   Orn, 495 F.3d at 632 (citing 20 C.F.R. §

3    404.1527(d)(2).  "In that event, the ALJ is instructed by § 404.1527(d)(2) to consider the factors

4    listed in § 404.1527(d)(2)-(6) in determining what weight to accord the opinion of the treating

5    physician."  Orn, 495 F.3d at 632.  The factors to be considered include the " '[l]ength of the

6    treatment relationship and the frequency of examination' by the treating physician, the '[n]ature

7    and extent of the treatment relationship' between the patient and the treating physician, the

8    '[s]upportability' of the physician's opinion with medical evidence, and the consistency of the

9    physician's opinion with the record as a whole.' "  Ghanim v. Colvin, 763 F.3d 1154, 1161 (9th

10   Cir. 2014) (quoting 20 C.F.R. § 404.1527(c)(2)-(6)).  "In many cases, a treating source's medical

11   opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the

12   test for controlling weight."  Ghanim, 763 F.3d at 1161 (quoting Orn, 495 F.3d at 631).

13       Here, the ALJ found that the opinions of Drs. Stone and Peterson were not supported by

14   the objective evidence in the record and was inconsistent with the treatment record.  Therefore,

15   they were not entitled to controlling weight.

16       3.    Dr. Stone's October 2016 Opinion

17       Specifically, the ALJ gave little weight to the October 2016 opinion by Dr. Stone finding

18   that it was brief and conclusory with little in the way of clinical findings to support the

19   conclusion.  (AR 27.)  Dr. Stone identified Plaintiff's diagnosis as chronic fatigue syndrome.

20   (AR 1880.)  On the form, she did not identify any clinical findings and objective signs to support

21   her opinion, leaving that section blank.  (AR 1880.)  When asked to characterized the nature,

22   location, frequency, precipitating factors, and severity of Plaintiff's pain, Dr. Stone stated,

23   "generalized, she can tell you."  (AR 1880.)

24       The ALJ noted that Dr. Stone's notes did not relate her opinion to either objective

25   findings or specific clinical observations.  (AR 27.)  "An ALJ is not required to take medical

26   opinions at face value, but may take into account the quality of the explanation when

27   determining how much weight to give a medical opinion."  Ford v. Saul, 950 F.3d 1141, 1155

28   (9th Cir. 2020) (citing 20 C.F.R. § 404.1527(c)(3)).  While the ALJ cannot reject a physician's

1   opinion merely for being expressed as answers to a check-the-box questionnaire, "the ALJ may

2   permissibly reject check-off reports that do not contain any explanation of the bases of their

3   conclusions[.]"  Ford, 950 F.3d at 1155 (quoting Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir.

4   2012); and Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996)).

5       The ALJ noted that Dr. Stone reported treating Plaintiff for two years of neuropathy in

6   the feet but her treating records offered scare evidence to corroborate the existence of the

7   condition or the severity of the assessed limitations.  (AR 27.)  Review of the records cited by the

8   ALJ provide substantial evidence to support the ALJ's findings that the treatment records do not

9   contain any complaints or objective findings to support Dr. Stone's assertion that she has been

10  treating Plaintiff for neuropathy of the feet for two years or objective findings to support the

11  other limitations opined.  The ALJ need not accept the opinion of any physician that is brief,

12  conclusory, and unsupported by clinical findings.  Thomas, 278 F.3d at 957.  Although Dr. Stone

13  opined significant limitations based on a finding that Plaintiff had chronic fatigue syndrome, the

14  record is largely devoid of any objective findings of fatigue or pain and as Dr. Stone noted in her

15  report she relied on Plaintiff's subjective complaints which as discussed below the ALJ properly

16  found to not be credible.  An ALJ can reject a physician's opinion that is premised on a

17  claimant's subjective complaints that have been properly discounted.  Fair v. Bowen, 885 F.2d

18  597, 605 (1989).

19      The ALJ provided specific and legitimate reasons to reject the October 2016 medical

20  source statement from Dr. Stone.

21          4.    Dr. Peterson

22      The ALJ gave little weight to the March 2018 medical source statement opinion of Dr.

23  Peterson because the severity of the assessment was not supported by the objective findings or

24  the treatment history.  Plaintiff does not point to any objective findings that would contradict the

25  ALJ's finding that the opinion is without support in the medical records.  Although Plaintiff

26  frequently complains of pain, review of the medical record shows unremarkable examinations

27  with no findings of pain, tender points, or trigger points on examination.

28      The ALJ noted that Dr. Peterson based his opinion on diagnoses including fibromyalgia

and POTS but did not identify any trigger points to establish fibromyalgia.   As the ALJ discussed, Dr. Peterson stated that tender points or trigger points were not applicable, but his opinion, at least in part was based on a diagnosis of fibromyalgia.   To establish fibromyalgia requires a history of widespread pain in all quadrants of the body that has persisted for at least 3 months, although it may fluctuate in intensity and need not always be present, and "[a]t least 11 positive tender points on physical examination" which "must be found bilaterally (on the left and right sides of the body) and both above and below the waist."  Soc. Sec. Ruling, SSR 12-2p; Titles II & XVI: Evaluation of Fibromyalgia, SSR 12-2P (S.S.A. July 25, 2012).  Dr. Peterson stated that the diagnosis was based on tender or trigger points but inconsistently stated that tender or trigger points were not applicable.

The ALJ also gave little weight to the March 27, 2018 mental medical source statement of Dr. Peterson.  (AR 29, 2130-2131.)  Dr. Peterson opined that Plaintiff that Plaintiff was precluded from performing mental tasks for fifteen percent or more of an eight hour workday or would be absent from work more than four days per month due to symptoms and treatment finding no evidence that Dr. Peterson treated Plaintiff for her mental impairment, the opinion is not related to an area of his specialization, and he presented no support for his opinion on the matter.  (AR 29, 2130.)   While Dr. Peterson opined that Plaintiff's mental impairments significantly affected her ability to perform unskilled work, as the ALJ noted Dr. Peterson presented no support for the opinion, Plaintiff did not receive any treatment for mental conditions, and Plaintiff does not cite to, nor does the court find, any abnormal mental status examinations that would support Dr. Peterson's opinion.[5]

The ALJ found that there were internal inconsistences within Dr. Peterson's March 2018 opinion, as well as the that the limitations imposed were not supported by objective findings in the record, which constitute a legitimate basis for rejecting the opinion.  Morgan v. Comm'r, 169

---

[5] The ALJ gave greater weight to the opinion of Dr. Franco which was consistent with the opinion of the consultative examiner, Dr. Ahmadshahi who found that Plaintiff only mild limitations and impairment in her ability to do detailed and complex instructions; to maintain concentration, persistence, and pace; associate with day-to day work activity, including attendance and safety; to maintain regular attendance in the workplace and perform work activities on a consistent basis; and to perform activities without special or additional supervision. (AR 1460.)  The opinion of the agency physician is substantial evidence to support the opinion where it is consistent with other independent evidence in the record.  Tonapetyan, 242 F.3d at 1149.

1   F.3d 595, 603 (9th Cir. 1999); Thomas, 278 F.3d at 957; Ford, 950 F.3d at 1154.

2       Plaintiff argues that the ALJ's findings are based on a misunderstanding of POTS

3   syndrome, but the ALJ could reasonably find based on the evidence cited that Dr. Peterson's

4   opinion was inconsistent with the evidence in the record.  Where the evidence is susceptible to

5   more than one reasonable interpretation, the ALJ's decision must be upheld.  Burch, 400 F.3d at

6   679.

7       The ALJ provided specific and legitimate reasons to reject the opinions of Drs. Stone and

8   Peterson that are supported by substantial evidence in the record.

9       **D.**     **Plaintiff's Symptom Testimony**

10      Plaintiff contends that the ALJ erred by failing to provide clear and convincing reasons to

11   reject her symptom testimony.  Plaintiff argues that the ALJ just set forth vague and conclusory

12   stock language that does not rise to the level of clear and convincing reasons.  Plaintiff asserts

13   that the ALJ relied on her own lay misunderstanding of her conditions.

14      Defendant counters that the ALJ properly found that Plaintiff's complaints were not

15   supported by the record based upon the medical evidence, her daily activities, and her treatment

16   history.

17      "An ALJ is not required to believe every allegation of disabling pain or other non-

18   exertional impairment."  Orn, 495 F.3d at 635 (internal punctuation and citations omitted).

19   Determining whether a claimant's testimony regarding subjective pain or symptoms is credible,

20   requires the ALJ to engage in a two-step analysis.  Molina, 674 F.3d at 1112.  The ALJ must first

21   determine if "the claimant has presented objective medical evidence of an underlying impairment

22   which could reasonably be expected to produce the pain or other symptoms alleged."

23   Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations

24   omitted).  This does not require the claimant to show that her impairment could be expected to

25   cause the severity of the symptoms that are alleged, but only that it reasonably could have caused

26   some degree of symptoms.  Smolen, 80 F.3d at 1282.

27      Then "the ALJ may reject the claimant's testimony about the severity of those symptoms

28   only by providing specific, clear, and convincing reasons for doing so."   Brown-Hunter v.

1  Colvin, 806 F.3d 487, 488–89 (9th Cir. 2015).  "The ALJ must specifically make findings that

2  support this conclusion and the findings must be sufficiently specific to allow a reviewing court

3  to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not

4  arbitrarily discredit the claimant's testimony."  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir.

5  2004) (internal punctuation and citations omitted).  Factors that may be considered in assessing a

6  claimant's subjective pain and symptom testimony include the claimant's daily activities; the

7  location, duration, intensity and frequency of the pain or symptoms; factors that cause or

8  aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other

9  measures or treatment used for relief; functional restrictions; and other relevant factors.

10  Lingenfelter, 504 F.3d at 1040; Thomas, 278 F.3d at 958.  In assessing the claimant's credibility,

11  the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the

12  claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other

13  testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately

14  explained failure to seek treatment or to follow a prescribed course of treatment. . .."

15  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).

16  The district court is constrained to review those reasons that the ALJ provided in finding the

17  claimant's testimony not credible.  Brown-Hunter, 806 F.3d at 492.

18      The ALJ referenced the findings that were made in addressing those conditions that were

19  found to be non-severe.  (AR 22-23, 25.)  The ALJ found it notable that Plaintiff reported that

20  she felt best when she was using florinef, salt, water, and Gatorade, but a progress note in April

21  of 2015 states she was not taking her florinef as prescribed.  (AR 22-23.)

22      The ALJ considered that Plaintiff alleges that she is limited in her ability to work by

23  fibromyalgia, Scheuermann's kyphosis, myalgic encephalomyelitis/chronic fatigue syndrome,

24  heart palpitations, heat sensitivity, sensory amplification, and inability to lift heavy things.  (AR

25  23, 318, 342, 370, 387, 403.)  She alleges she has daily fatigue and pain in the shoulders, neck

26  and back eighty percent of the time such that she can lift fifteen pounds, carry a gallon of water,

27  stand five minutes on a bad day and fifteen minutes on a good day, walk one block, and sit

28  fifteen minutes.  (AR 23, 72, 74, 79-81.)  The ALJ found that Plaintiff's medically determinable

impairments could reasonably be expected to cause the alleged symptoms; however, her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.  (AR 25.)

First, the ALJ found that the objective medical evidence was inconsistent with Plaintiff's allegation that she was unable to perform any work activity.  The ALJ considered that as early as 2011, Plaintiff's treating neurologist, Dr. Miller, noted that her presentation had a "marked somatoform flavor" that was noted in multiple visits.  (AR 26, 860.)  On February 6, 2014, Dr. Miller noted that although Plaintiff expressed a wide range of complaints she refused to take medication for them.  (AR 852.)  She was noted to be bright, affable, fluent, cogent, and oriented.  (AR 852.)  Her range of affect was normal with overriding somatic preoccupation. (AR 852.)

On August 6, 2014, Dr. Miller noted Plaintiff alleged a very wide ranging set of complaints and her symptoms were explained with "*la belle indifference*."  (AR 851.)  His assessment notes somatoform presentation and diffuse musculoskeletal complaints.  (AR 851.)

On September 25, 2014, Dr. Miller noted that Plaintiff described widespread migratory complaints that were so severe that she had to drop out of school, but she had managed to go to Costa Rica and engage in other foreign travel.  (AR 1398.)  She discussed that she was angry with Dr. Mackey at USCF who had opined that she was not as ill as she felt.  (AR 1398.)  He noted that the severity of her complaints were reminiscent of a personality disorder.  (AR 1398.)

On February 12, 2015, Dr. Miller noted that Plaintiff was very upset that he felt she had somatization disorder and had brought her father to support her argument that she had a condition.  (AR 1401.)  He found that her history struck him as being more appropriate for somatic symptom disorder and noted her strong emotional response to his diagnosis was most consistent with a condition that is "heavily guarded in psychiatric terms.  (AR 1401.)  The importance of her efforts to convince him argued strongly for somatic symptom disorder.  (AR 1401.)

On April 29, 2015, Dr. Johnson noted "suspect neurogenic syncope with moderate POTS

1  all exaggerated by severe anxiety with/without personality disorder?" (AR 1410.) Plaintiff

2  refused to take Lexapro or other medication for hypotension and was "Not taking florinef

3  daily!!" (AR 1410.) Plaintiff was advised to consider a psychological evaluation. (AR 1411.)

4        The ALJ found that since the alleged onset date, Plaintiff has continued to seek treatment

5  for various symptoms, but clinical and diagnostic evidence has been largely unremarkable. (AR

6  26.) For instance, the ALJ pointed to the October 20, 2014 visit for abdominal pain in which the

7  work-up showed no significant abnormality and did not reveal etiology. (AR 26, 1142, 1413-

8  1415.) The ALJ found that the medical records, while voluminous, largely reflect no more than

9  Plaintiff's own reports of feeling run down. The ALJ noted Plaintiff's encounter history from

10  2014 to 2017 showing complaints on April 4, 2016 and May 26, 2017 of feeling run down. (AR

11  26, 1892.)

12        The ALJ also noted that although Plaintiff claimed to have symptoms and had been

13  diagnosed with fibromyalgia, objective evidence of trigger points which are essential to the

14  diagnosis were not present. (AR 26.) "While subjective pain testimony cannot be rejected on

15  the sole ground that it is not fully corroborated by objective medical evidence, the medical

16  evidence is still a relevant factor in determining the severity of the claimant's pain and its

17  disabling effects." Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. §

18  404.1529(c)(2)).

19        The ALJ also noted that Plaintiff had not received any treatment for her mental health

20  symptoms and the consultative mental examination found only mild mental impairments. (AR

21  26, 1460.) The ALJ also noted that although Plaintiff reported that her symptoms were better

22  with florinef, salt, water, and Gatorade, she did not take her florinef as prescribed. (AR 22-23,

23  1410.) The records cited by the ALJ include substantial evidence that Plaintiff was not

24  compliant with her medication and treatment recommendations. (AR 467, 852, 1381, 1386,

25  1410, 1474, 1501, 1636.) In assessing a claimant's credibility, the ALJ may properly rely on

26  "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course

27  of treatment." Molina, 674 F.3d at 1113.

28        The Court does not address whether the ALJ erred by relying on Plaintiff's daily

1    activities or by finding that her symptoms were controlled by her medication regimen as a reason

2    to reject her credibility, because any such error would be harmless given that other clear and

3    convincing reasons were provided for the credibility finding.

4           The Court finds that the ALJ provided specific clear and convincing reasons to reject

5    Plaintiff's symptom testimony that are supported by substantial evidence in the record.

6                  **E.      Duty to Develop the Record**

7           Plaintiff argues that there is considerable ambiguity identified in the record that triggered

8    the ALJ's duty to further develop the record by sending Plaintiff to a physical consultative

9    examination, calling a medical expert to testify, or contacting Dr. Peterson to clarify the issue.

10   Plaintiff contends that the hearing transcript shows that the ALJ continually stated that she was

11   unfamiliar with the POTS diagnosis and was confused regarding whether it was an immunology

12   or hormonal diagnosis, and was going to have to look at the evidence carefully and do outside

13   research.

14          Defendant contends that Plaintiff's contention that the ALJ was required to further

15   develop the record is unavailing.   Defendant argues that Plaintiff's counsel asserted at the

16   hearing that the record was complete other than some school records.   Defendant also asserts that

17   Plaintiff has not explained what ambiguity a consultative examination, medical expert, or further

18   evidence in the record would address.

19          When applying for disability benefits, the claimant has the duty to prove that she is

20   disabled.   42 U.S.C. § 423(c)(5)(A).   The ALJ has an independent "duty to fully and fairly

21   develop the record and to assure that the claimant's interests are considered."   Widmark v.

22   Barnhart, 454 F.3d 1063, 1068 (9th Cir. 2006) (quoting Brown v. Heckler, 713 F.2d 441, 443

23   (9th Cir. 1983)).   The ALJ has a duty to further develop the record where the evidence is

24   ambiguous or the ALJ finds that the record is inadequate to allow for proper evaluation of the

25   evidence.   Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001); Tonapetyan, 242 F.3d at

26   1150.   The ALJ may discharge this duty by subpoenaing or submitting questions to the

27   claimant's physician, continuing the hearing, or keeping the record open after the hearing to

28   allow the claimant to supplement the record.   Tonapetyan, 242 F.3d at 1150.

1    Here, the ALJ inquired whether there were additional records that Plaintiff wanted

2    admitted and gave her until April 27 to submit any additional information to supplement the

3    record.  (AR 67.)

4    A specific finding of ambiguity or inadequacy in the record is not required to trigger the

5    necessity to further develop the record where the record itself establishes the ambiguity or

6    inadequacy.  McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011).  Plaintiff relies on comments

7    that the ALJ made in response to Plaintiff and her father's testimony regarding her diagnoses.

8    However, neither Plaintiff nor her father are medical experts and their assertions regarding

9    medical diagnoses cannot create an ambiguity in the record.

10    Plaintiff argues that there were new diagnoses and that the ALJ was unfamiliar with the

11    POTS diagnosis, but the ALJ relied on the opinion of Dr. Fast who considered the POTS

12    diagnosis on reconsideration and found that it did not preclude Plaintiff from working.  (See AR

13    158-159.)  Here, Plaintiff points to no evidence that there were any new diagnoses or test results

14    that were not considered by the agency physicians.  Rather review of the record shows that

15    Plaintiff continued to receive similar treatment with medications and supplements, both before

16    and after Dr. Fast reviewed the record.

17    The facts in this case are not similar to other instances in which the ALJ was found to

18    have a duty to further develop the record.  See Tonapetyan, 242 F.3d at 1150-51 (ALJ erred by

19    relying on testimony of physician who indicated more information was needed to make

20    diagnosis); McLeod, 640 F.3d at 887 (ALJ erred by failing to obtain disability determination

21    from the Veteran's Administration); Bonner v. Astrue, 725 F.Supp.2d 898, 901-902 (C.D. Cal.

22    2010) (ALJ erred where failed to determine if claimants benefits were property terminated or

23    should have been resumed after his release from prison); Hilliard v. Barnhart, 442 F.Supp.2d

24    813, 818-19 (N.D. Cal. 2006) (ALJ erred by failing to develop record where he relied on the

25    opinion of a physician who recognized he did not have sufficient information to make a

26    diagnosis).  The Court finds that the ALJ did not err by failing to further develop the record.

27    **F.    Step Five**

28    Plaintiff contends that the ALJ erred at step five by relying on the grids to determine that

there are jobs available in the national economy that Plaintiff can perform.  Plaintiff argues that since her impairments result in exertional and non-exertional limitations the testimony of a vocational expert was required on the issue of whether her limitations precluded work activity.

Plaintiff points out that a VE was scheduled to testify at the hearing and did not appear. The ALJ noted that if she needed additional information she could do interrogatories to the VE. (AR 96.)  To the extent that Plaintiff argues that since the VE was scheduled to appear at the hearing such testimony was required, the Court finds no merit to the argument.  While a VE will usual testify at the administrative hearing, the failure to have VE testimony by itself is not error.

In determining if there are jobs that the claimant can perform, the regulations divide inquiry into two stages.  Heckler v. Campbell, 461 U.S. 458, 460 (1983).  Initially, the claimant's present job qualifications must be addressed as relevant to Plaintiff's physical ability, age, education, and work experience ("the four factors").  Heckler, 461 U.S. at 460.  The ALJ next considers whether jobs exist in the national economy that a person having the claimant's qualifications could perform.  Id. at 461.

To assist in the step-five determination and assure uniformity and efficiency of this process, the Social Security Administration established the Medical–Vocational Guidelines (the grids), which 'consist of a matrix of [the four factors] and set forth rules that identify whether jobs requiring a specific combination of these factors exist in significant numbers in the national economy.' "  Heckler, 461 U.S. at 461–62; see also Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988) (the grids were promulgated to improve the efficiency and uniformity of Social Security disability benefits determinations).  Where the grids match the claimant's qualifications, "the guidelines direct a conclusion as to whether work exists that the claimant could perform."  Heckler, 461 U.S. at 462.  If the grids show that such work exists, then the claimant is determined not to be disabled.  Id.  In Heckler, the Supreme Court held that the Commissioner could reasonably choose to rely on these guidelines in appropriate cases rather than on the testimony of a vocational expert in each case."  Id. at 470.

"[T]he fact that a non-exertional limitation is alleged does not automatically preclude application of the grids" and the ALJ is to "first determine if a claimant's non-exertional

1    limitations significantly limit the range of work permitted by his exertional limitations."

2    Desrosiers, 846 F.2d at 577.  "Where the grids do not match the claimant's qualifications, the

3    ALJ can either (1) use the grids as a framework and make a determination of what work exists

4    that the claimant can perform, see Soc. Sec. Ruling 83–14, 1983 WL 31254 (S.S.A.), or (2) rely

5    on a vocational expert when the claimant has significant non-exertional limitations."  Hoopai v.

6    Astrue, 499 F.3d 1071, 1075 (9th Cir. 2007).

7        There are times where a non-exertional impairment is sufficiently severe and "may limit

8    the claimant's functional capacity in ways not contemplated by the guidelines" making the

9    guidelines inapplicable.  Desrosiers, 846 F.2d at 577.  "The grids provide broad categories of

10   exertional limitations (and to a certain extent non-exertional limitations) and the range of jobs in

11   each category."  Hoopai, 499 F.3d at 1076.  In Hoopai, the claimant was found to be moderately

12   limited in his ability to maintain concentration, persistence, and pace.  Id. at 1077.  The ALJ

13   limited him to light work.  Id. at 1074.  On appeal, the Ninth Circuit held that since they had "not

14   previously held mild or moderate depression to be a sufficiently severe non-exertional limitation

15   that significantly limits a claimant's ability to do work beyond the exertional limitation[,]"

16   "substantial evidence supported the ALJ's conclusion that the depression was not a sufficiently

17   severe non-exertional limitation that prohibited the ALJ's reliance on the grids without the

18   assistance of a vocational expert."  Id.

19       Plaintiff's reliance on cases such as Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996,

20   1002 (9th Cir. 2015), and Zavalin v. Colvin, 778 F.3d 842 (9th Cir. 2015), which address

21   inconsistencies between the residual functional capacity assessment and the Dictionary of

22   Occupational Titles ("DOT") for the jobs which the ALJ found that claimant can perform are

23   misplaced.  Here, it is not an inconsistency with the DOT that is at issue, but whether the non-

24   exertional impairments would significantly limit Plaintiff's ability to perform work at the

25   sedentary level.  The non-exertional impairments found by the ALJ are that she cannot have

26   exposure to hazardous work environments, such as working at unprotected heights, operating fast

27   or dangerous machinery, or driving commercial vehicles; and she is limited to non-complex,

28

routine tasks in a static environment.[6]  (AR 25.)  The ALJ found that these limitations had little to no effect on the occupational base for unskilled sedentary work and a finding of not disabled was appropriate.  (AR 30.)

The ALJ found that the limitation to no hazardous work environments did not erode the occupational base was supported by SSR 96-9p.  (AR 30.)

> The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  "Occasionally" means occurring from very little up to one- third of the time, and would generally total no more than about 2 hours of an 8-hour workday.  Sitting would generally total about 6 hours of an 8-hour workday.  Unskilled sedentary work also involves other activities, classified as "nonexertional," such as capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions.
> . . .
> The rules in Table No. 1 direct conclusions as to disability where the findings of fact coincide with all of the criteria of a particular rule; i.e., RFC (a maximum sustained work capability for sedentary work) and the vocational factors of age, education, and work experience.  In order for a rule in Table No. 1 to direct a conclusion of "not disabled," the individual must be able to perform the full range of work administratively noticed by a rule.  This means that the individual must be able to perform substantially all of the strength demands defining the sedentary level of exertion, as well as the physical and mental nonexertional demands that are also required for the performance of substantially all of the unskilled work considered at the sedentary level.  Therefore, in order for a rule to direct a conclusion of "not disabled," an individual must also have no impairment that restricts the nonexertional capabilities to a level below those needed to perform unskilled work, in this case, at the sedentary level.

Titles II & Xvi: Determining Capability to Do Other Work-Implications of A Residual Functional Capacity for Less Than A Full Range of Sedentary Work, SSR 96-9P (S.S.A. July 2, 1996).

Pursuant to SSR 96-9P, a need to avoid all exposure to dangerous conditions would not result in a significant erosion to the occupational base, because such hazards are considered unusual in unskilled sedentary work.  Id.  "Where it is clear that the additional limitation or restriction has very little effect on the exertional occupational base, the conclusion directed by

---

[6] Other than a challenge to the weight provided to the physician opinions, Plaintiff does not specifically challenge the finding that she is able to perform non-complex, routine tasks in a static work environment.  Accordingly, the Court finds that she has therefore waived the issue.  Ghanim, 763 F.3d at 1165.

the appropriate rule in Tables No. 1, 2, or 3 would not be affected."  Titles II & Xvi: Capability to Do Other Work-The Medical-Vocational Rules As A Framework for Evaluating A Combination of Exertional & Nonexertional Impairments, SSR 83-14 (S.S.A. 1983). Accordingly, if this were the only limitation imposed, the ALJ could rely on the grids, but the ALJ also found that Plaintiff was limited to non-complex routine work in static environment.

The ALJ relied on SSR 85-15.  "[U]nskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work. These jobs ordinarily involve dealing primarily with objects, rather than with data or people, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis."  Titles II & XVI: Capability to Do Other Work-The Medical-Vocational Rules As A Framework for Evaluating Solely Nonexertional Impairments, SSR 85-15 (S.S.A. 1985).  By its terms, SSR 85-15 applies only where there are no exertional limitations.  See Gunderson v. Astrue, 371 F. App'x 807, 809 (9th Cir. 2010) ( citing Roberts v. Shalala, 66 F.3d 179, 183 (9th Cir. 1995) (quoting SSR 85–15) (The Ninth Circuit has held that "SSR 85–15 provides guidance only for cases in which the claimant asserts 'solely nonexertional impairments.' ").  Because Plaintiff has alleged and the ALJ found exertional and nonexertional limitations, SSR 85-15 does not apply.

Dr. Franco reviewed the record and found that, giving Plaintiff the benefit of the doubt, her symptoms were slightly more than severe and she was limited to one to two step instructions. (AR 156.)  Based on this opinion and the consultative examination, the ALJ found that Plaintiff could perform non-complex routine work in a static environment.  Defendant contends that this limitation would not significantly erode Plaintiff's unskilled sedentary occupational base under the grids.  Defendant argues that because unskilled work includes numerous jobs that can be performed after a short demonstration or within thirty days (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(a)), and is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time (citing 20 C.F.R. § 416.968(a)), the ALJ's finding that Plaintiff can perform unskilled work in a static work environment would not significantly

1   erode the occupational base and should be affirmed.

2   However, the ALJ found that Plaintiff can perform non-complex routine work in static

3   environment and provided no evidence for how this limitation would affect the occupational base

4   other than her conclusory opinion that the occupational base would not be significantly eroded.

5   While the regulations do allow the ALJ to rely on the grids "[w]here it is clear that the additional

6   limitation or restriction has very little effect on the exertional occupational base[,]" Titles II &

7   Xvi: Capability to Do Other Work-The Medical-Vocational Rules As A Framework for

8   Evaluating A Combination of Exertional & Nonexertional Impairments, SSR 83-14 (S.S.A.

9   1983), they also provide that

> A less than substantial loss of ability to perform any of the above basic work
> activities may or may not significantly erode the unskilled sedentary occupational
> base.  The individual's remaining capacities must be assessed and a judgment
> made as to their effects on the unskilled occupational base considering the other
> vocational factors of age, education, and work experience.  When an individual
> has been found to have a limited ability in one or more of these basic work
> activities, it may be useful to consult a vocational resource.

14   SSR 96-9P.  Because there is no evidence on how much the occupational data base would be

15   eroded due to the limitation to non-complex routine work in static environment, the Court finds

16   that substantial evidence does not support the ALJ's finding that work exists in the national

17   economy that Plaintiff can perform.

18   Accordingly, this matter shall be remanded for further fact-finding at step five.  On

19   remand, the ALJ shall solicit the opinion of a vocational expert to determine the type of work, if

20   any, that Plaintiff is capable of performing.

21                                                  **V.**

22                              **CONCLUSION AND ORDER**

23   Based on the foregoing, the Court finds that the ALJ erred by relying on the grids at step

24   five to determine that work existed in the national economy that Plaintiff could perform.

25   Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the

26   Commissioner of Social Security is GRANTED and this matter is remanded back to the

27   Commissioner of Social Security for further proceedings consistent with this order.  It is

28   FURTHER ORDERED that judgment be entered in favor of Plaintiff Jane Tatum and against

Defendant Commissioner of Social Security.  The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   **December 23, 2020**

UNITED STATES MAGISTRATE JUDGE